J. S26027/17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
MICHAEL ALLEN WILLIAMS, :
:
APPELLANT :
: No. 1259 MDA 2016

Appeal from the PCRA Order June 28, 2016
In the Court of Common Pleas of Lebanon County
Criminal Division at No(s): CP-38-CR-0000414-2014

BEFORE: BOWES, J., DUBOW, J., and FITZGERALD, J.[*]

MEMORANDUM BY DUBOW, J.: **FILED JUNE 22, 2017**

Appellant, Michael Allen Williams, appeals from the June 28, 2016 Order denying his first Petition for relief filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-46, and challenges, *inter alia*, the effectiveness of trial counsel. After careful review, we affirm on the basis of the trial court's Opinion.

The trial court's Pa.R.A.P. 1925(a) Opinion includes a thorough and complete narrative of the facts and procedural history of this case, which we adopt for purposes of this appeal. *See* Trial Court Opinion, filed 6/28/16, at 2-12. While we will not go into exhaustive detail here, some of the relevant facts are as follows.

---

[*] Former Justice specially assigned to the Superior Court.

On February 15, 2014, at a bar in the city of Lebanon, Appellant, believing that the victim had been flirting with his girlfriend, entered the bar with a knife in his hand, walked directly up to the victim at a fast pace, and began stabbing him. Although the victim was unarmed, he was able to fight off Appellant, eventually subduing him. The bartender, Lori Smith, witnessed the fight. In addition, security cameras inside the bar captured the entire incident from two different angles. Police transported the victim, who was bleeding heavily from 13 stab wounds, to the Hershey Medical Center by ambulance, where he was treated for his injuries.

Police officers who responded to the scene arrested Appellant and charged him with Attempted Homicide, Aggravated Assault, and other related charges.

Appellant proceeded to a jury trial. On August 6, 2014, the jury acquitted Appellant of the Attempted Homicide charge, but found him guilty of Aggravated Assault and all other related charges. On October 29, 2014, the trial court sentenced Appellant to 11½ to 23 years of imprisonment.

Appellant filed a timely *pro se* PCRA Petition. The PCRA court appointed counsel, who filed an Amended PCRA Petition on April 5, 2016.

The PCRA court held an evidentiary hearing on June 20, 2016. On June 28, 2016, the PCRA court entered an Order denying Appellant's PCRA Petition.

Appellant timely appealed, and all parties complied with Pa.R.A.P. 1925. On appeal, Appellant raises six issues.

> 1. Whether Trial Counsel was ineffective when she failed to object to the Commonwealth's leading questions and hearsay evidence from multiple witnesses during Appellant's [t]rial?
>
> 2. Whether Trial Counsel was ineffective when she failed to call witnesses on Appellant's behalf at trial where the Appellant gave Trial Counsel a list of potential witnesses and phone numbers and specifically told Trial Counsel that he definitely wanted [Appellant's girlfriend,] Melissa Eiler[,] to testify on his behalf?
>
> 3. Whether Trial Counsel was ineffective when she failed to properly cross-examine the Commonwealth's witness, Lori Smith, where her testimony clearly contradicted the video footage, and where said contradiction would have shown the jury that it was plausible that [] Appellant did not wield a weapon?
>
> 4. Whether Trial Counsel was ineffective when she failed to introduce the alleged victim's toxicology reports from the night of the alleged incident, where said reports were known and available to Trial Counsel, and would have supported Appellant's self-defense claim?
>
> 5. Whether Trial Counsel was ineffective when she allowed the Trial Court to utilize an incorrect criminal record at [s]entencing?
>
> 6. Whether Appellant was denied his constitutionally-guaranteed right to due process when the Commonwealth disclosed information to the alleged victim prior to his testimony, regarding the whereabouts of the weapon that was used in the alleged incident?

Appellant's Brief at 4-5 (reordered for ease of disposition).

When reviewing the denial of PCRA Petition, "we examine whether the PCRA court's determination is supported by the record and free of legal error." *Commonwealth v. Fears*, 86 A.3d 795, 803 (Pa. 2014) (internal quotation marks and citation omitted). We grant great deference to the

findings of the PCRA court, and "these findings will not be disturbed unless they have no support in the certified record." ***Commonwealth v. Wilson***, 824 A.2d 331, 333 (Pa. Super. 2003). "The scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level." ***Commonwealth v. Spotz***, 84 A.3d 294, 311 (Pa. 2014) (citation omitted). Moreover, "[w]here a PCRA court's credibility determinations are supported by the record, they are binding on the reviewing court." ***Commonwealth v. White***, 734 A.2d 374, 381 (Pa. 1999). With this standard in mind, we address each of Appellant's claims.

## Ineffective Assistance Claims

Appellant's first five issues contend that trial counsel provided ineffective assistance to Appellant. In analyzing claims of ineffective assistance of counsel, we presume that counsel was effective unless the PCRA petitioner proves otherwise. ***Commonwealth v. Williams***, 732 A.2d 1167, 1177 (Pa. 1999). In order to succeed on a claim of ineffective assistance of counsel, Appellant must demonstrate (1) that the underlying claim is of arguable merit; (2) that counsel's performance lacked a reasonable basis; and (3) that the ineffectiveness of counsel caused the appellant prejudice. ***Commonwealth v. Fulton***, 830 A.2d 567, 572 (Pa. 2003). "[Where] the underlying claim lacks arguable merit, counsel cannot be deemed ineffective for failing to raise it." ***Commonwealth v. Koehler***,

36 A.3d 121, 140 (Pa. 2012). Appellant bears the burden of proving each of these elements, and his "failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness." *Commonwealth v. Daniels*, 963 A.2d 409, 419 (Pa. 2009) (citation omitted).

In his first ineffectiveness claim, Appellant points to seven specific instances in which he avers that the Commonwealth improperly asked leading questions of witnesses or elicited hearsay testimony from witnesses. In each of these seven instances, Appellant avers that trial counsel was ineffective for failing to object. *See* Appellant's Brief at 9-20. The Honorable Bradford H. Charles has authored a comprehensive, thorough, and well-reasoned Opinion, separately addressing each of Appellant's seven claims, with references to the record and a thorough discussion of the relevant case law. After a careful review of the parties' arguments and the record, we affirm on the basis of that Opinion, which found that certain leading questions from the Commonwealth were not improper, and that Appellant was not prejudiced by trial counsel's failure to object where the testimony or questions may have been improper. *See* Trial Court Opinion at 14-21.

Second, Appellant avers that trial counsel was ineffective for failing to call three witnesses: his girlfriend, Melissa Eiler, as well as Java Pinson, Dawn Justiano, and Latoya Williams. Appellant's Brief at 20-26. Judge Charles' Opinion includes a comprehensive, thorough, and well-reasoned

discussion of this claim. After a careful review of the parties' arguments, and the record, we affirm on the basis of that Opinion, which found that: (i) Appellant failed to establish that Java Pinson, Latoya Williams, or Latoya Williams were known to trial counsel and available at trial; (ii) trial counsel strategically chose not to call Melissa Eiler because her testimony, that the victim had made romantic advances towards her, would support the Commonwealth's theory of motive; and (iii) Appellant was not prejudiced by trial counsel's failure to call Melissa Eiler because she could only testify to threats the victim made to Appellant **after** Appellant had already stabbed the victim. Trial Court Opinion at 22-23.

Third, Appellant avers that trial counsel was ineffective for failing to cross-examine Commonwealth's witness Lori Smith on alleged inconsistencies between her testimony and the surveillance footage of the attack. Appellant's Brief at 27-31. Judge Charles' Opinion includes a comprehensive, thorough, and well-reasoned discussion of this claim. After a careful review of the parties' arguments, and the record, we affirm on the basis of that Opinion, which found that trial counsel was not ineffective for failing to cross-examine Lori Smith on the alleged inconsistencies because there were no substantive inconsistencies between her testimony at trial and the surveillance footage.[1] Trial Court Opinion at 23-24.

---

[1] At the PCRA hearing, Appellant explained the lack of substantive inconsistencies by averring that someone must have altered the surveillance

Fourth, Appellant avers that trial counsel was ineffective for failing to present a toxicology report that revealed that the victim had drugs in his system at the time Appellant stabbed him. Appellant's Brief at 31-35. Judge Charles' Opinion includes a comprehensive, thorough, and well-reasoned discussion of this claim. After a careful review of the parties' arguments, and the record, we affirm on the basis of that Opinion, which notes that trial counsel was not ineffective for failing to introduce the report into evidence because "no such toxicology report exists." Trial Court Opinion at 24.

Fifth, Appellant avers that trial counsel was ineffective for failing to challenge the veracity of four felony convictions from North Carolina that were included in Appellant's prior record score. Appellant's Brief at 38-44. Judge Charles' Opinion includes a comprehensive, thorough, and well-reasoned discussion of this claim. After a careful review of the parties' arguments, and the record, we affirm on the basis of that Opinion, which found that: (i) trial counsel was not ineffective for failing to challenge the inclusion of his prior convictions in Appellant's prior record score where she had investigated Appellant's mistaken identity claim and learned that his prior record had been verified using Appellant's name, date of birth, Social Security number, and fingerprints; and (ii) even if the contested convictions

---

footage. Trial Court Opinion at 23. The trial court found no evidence to support this claim, and Appellant does not advance this claim in his Brief to this Court.

had not been included in Appellant's prior record score, Judge Charles, who sentenced Appellant, would have imposed the same sentence. Trial Court Opinion at 25-28.

**Prosecutorial Misconduct**

In his final claim, Appellant avers that the prosecutor committed prosecutorial misconduct when she disclosed information to the victim in order to evoke that information from him during his direct examination. Appellant's Brief at 35-38. Specifically, Appellant avers that the victim testified at trial that Appellant "went home and took the knife off the wall to come back and kill [the victim]." *Id.* at 37. According to Appellant, there is no way the victim could have known that the knife hung on the wall in his home and, therefore, the Commonwealth must have improperly given the victim this information. *Id.*

Appellant's Brief quotes Appellant's testimony at the PCRA hearing, where he claimed to recall the victim offering that testimony at trial. *Id.* at 36-37. Appellant does not provide citation to the trial transcript indicating where the victim testified to the location of the knife in Appellant's home. Further, Appellant does not direct our attention to any evidence that would support his bald allegation of prosecutorial misconduct.

Judge Charles' Opinion includes a comprehensive, thorough, and well-reasoned discussion of this claim. After a careful review of the parties' arguments, and the record, we affirm on the basis of that Opinion, which

found, *inter alia*, that Appellant misrepresents the victim's testimony and the trial transcript is "devoid of any testimony indicating where [Appellant] kept a knife within his home." Trial Court Opinion at 24-25.

The parties are directed to attach a copy of the trial court's June 28, 2016 Opinion to all future filings.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/22/2017

ENTERED & FILED
CLERK OF COURTS
LEBANON, PA

2016 JUN 28 PM 4 00

**IN THE COURT OF COMMON PLEAS LEBANON COUNTY PENNSYLVANIA**

**CRIMINAL DIVISION**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | NO. CP-38-CR-414-2014 |
| | : | |
| v. | : | |
| | : | |
| MICHAEL WILLIAMS | : | |

**APPEARANCES**

Pier Hess, Esquire　　　　　　For Commonwealth of Pennsylvania
DISTRICT ATTORNEY'S OFFICE

Elizabeth Judd, Esquire　　　　For Michael Williams

**OPINION BY CHARLES, J.,　June 28, 2016**

Sometimes when we sit in PCRA Court, we silently wonder: "Can he really believe this?" In this case, Michael Williams (hereafter "DEFENDANT") stabbed another individual 13 times in a bar. The event was captured on videotape shown to jurors. Despite the overwhelming evidence against him, DEFENDANT now blames his conviction on his former lawyer. Without any supporting proof, he claims that the video surveillance tape was altered. Also without proof, he alleges that his trial counsel should have produced a non-existent toxicology report. He further complains that the official Court Reporter intentionally omitted testimonial exchanges that he professes to recall from the trial. If this were not enough, he also claims that his prior record was incorrectly reported...even though

1

it was verified by use of name, date of birth, Social Security Number _and_ fingerprints.

The more we listened to testimony at the time of the June 20, 2016 PCRA Hearing, the more we became convinced that DEFENDANT was suffering from self-serving delusions. For reasons that we unfortunately[1] are required to outline in more detail within the body of this Opinion, we will be denying all of DEFENDANT's PCRA issues.

## I. FACTS

DEFENDANT's charges arise as a result of an incident that occurred on February 15, 2014 at approximately 11:45 p.m. inside the Liberty Bar (hereafter "BAR") located in the City of Lebanon, Pennsylvania. (N.T. 79). Much of the incident was captured on a video recording system maintained by BAR.

Lori Smith (hereafter "SMITH") and Melissa Eiler (hereafter "EILER") were employed as bartenders at BAR. (N.T. 8). EILER's boyfriend was DEFENDANT. (N.T. 8). Patrick Embry (hereafter "VICTIM") was a customer at BAR. (N.T. 9). Prior to February 15, 2015, SMITH observed many verbal arguments between DEFENDANT and VICTIM. (N.T. 9)

---

[1] We use the word "unfortunately" because an extraordinary amount of judicial resources were expended to address DEFENDANT's frivolous arguments. A taxpayer-funded lawyer was appointed for DEFENDANT and that lawyer spent hours preparing for the PCRA Hearing. The Sheriff of Lebanon County was required to transport DEFENDANT from his state corrections institution home to Lebanon County for the hearing. One-half day of precious court time was allotted for DEFENDANT's PCRA Hearing. At some point, a transcript of that hearing will have to be prepared at taxpayer expense. While there are times when defendants possess legitimate PCRA arguments and the expenditure of resources on those arguments is essential to the process of justice, this is not one of those circumstances.

2

On the evening of February 15, 2014, both SMITH and EILER were working at BAR. EILER finished work at 9:00 p.m. EILER stayed in BAR after her shift had ended because DEFENDANT was there. They were both drinking. (N.T. 10). DEFENDANT and EILER left BAR but DEFENDANT returned approximately 45 minutes later. When DEFENDANT entered BAR the second time, he was talking on his cell phone. He sounded angry and was speaking loudly. DEFENDANT again left BAR. (N.T. 10-11). VICTIM came into BAR approximately one hour after DEFENDANT had left BAR the second time. (N.T. 11)

About one hour after the time VICTIM entered the Bar, SMITH noticed DEFENDANT outside BAR. SMITH noticed that DEFENDANT was walking very fast and she saw him stick something silver-ish into his jacket. At the time, VICTIM was sitting in the back part of BAR in the poolroom area drinking alcohol. (N.T. 12-13). SMITH did not see any signs that VICTIM was intoxicated. (N.T. 13).

Upon observing DEFENDANT, SMITH called 911. She was going to alert VICTIM that "it didn't look good" but was unable to do so. (N.T. 13). SMITH observed DEFENDANT enter BAR and approach VICTIM. She initially did not see any weapon. (N.T. 14). When DEFENDANT approached VICTIM, SMITH saw DEFENDANT pull a large knife out and hit VICTIM on the head a couple of times. (N.T. 15). SMITH testified that this knife was not the same type of knife that DEFENDANT used quite frequently to punch a hole in the top of his can of beer. (N.T. 22). At no

3

point during the evening did SMITH notice VICTIM with a weapon, nor did she hear anyone threaten DEFENDANT. (N.T. 23).

A fight broke out between DEFENDANT and VICTIM in the foyer of BAR. The fight then moved to the poolroom. (N.T. 15-16). SMITH was unable to watch the entire incident because it was "bloody and horrible." (N.T. 15). SMITH did witness the end of the fight. She observed DEFENDANT with the knife. She also saw VICTIM choking DEFENDANT. When VICTIM got a chance to get away, he got up and put his hoodie up and walked out the door. VICTIM was bleeding very heavily. (N.T. 16-17). SMITH stated that during this entire incident, she was on the phone with 911. (N.T. 16).

VICTIM testified that he received a phone call from EILER indicating that DEFENDANT was looking for him. (N.T. 39). While VICTIM was at BAR sitting at a table in the foyer area, he saw DEFENDANT walking toward him. (N.T. 39-40). VICTIM observed DEFENDANT walking very fast. At some point VICTIM saw DEFENDANT reach into his coat for what he believed may have been a weapon. Because VICTIM did not have a weapon, he tried to defend himself with his hands and body. (N.T. 40-41). VICTIM only realized that he was actually being attacked with a knife when he felt blood running down his head. (N.T. 41). VICTIM further stated that he was choking DEFENDANT and that when he felt DEFENDANT go limp, he dropped him, wiped the blood from his eyes, put up his hood and walked out of BAR. (N.T. 42; 48).

4

When the police arrived, VICTIM was not very happy that they became involved. Although VICTIM did allow police to call an ambulance and get him medical treatment, he did not initially want to talk about who was responsible for injuring him. Eventually, VICTIM told police that DEFENDANT was the person who had assaulted him. (N.T. 75).

Upon arrival at the hospital, VICTIM's clothing was pretty much soaked by blood. Hospital staff needed to cut the clothing off of VICTIM's body. VICTIM stated that the blood on the inside of his pants was due to the fact that while he was chocking DEFENDANT, DEFENDANT was "chopping at my leg" which resulted in three deep cuts. (N.T. 49). In addition to the multiple cuts to the head, and the cuts on his legs, VICTIM had cuts on his back, and cuts on both sides of his shoulders. (N.T. 52; Exh. 6A – 6E).

On February 15, 2014, Officers John Allen and Brandt Zimmerman of the Lebanon City Police Department were dispatched to BAR for a fight involving a knife. (N.T. 79). Officer Allen was given a description of the victim as wearing a gray sweatshirt and was told that he was outside of the building walking west on Mifflin Street. (N.T. 79). Upon arrival at the location of BAR, Officer Allen approached VICTIM and yelled out to him. VICTIM stopped, turned around, and was in a fighting stance. Once VICTIM realized that Officer Allen was a police officer, he relaxed and Officer Allen was able to speak with him. Officer Allen noticed that VICTIM was bleeding profusely from his head at which time he had VICTIM sit

5

down. (N.T. 80). Officer Allen testified that the blood was pooling around VICTIM's feet. He also observed full depth wound cuts to VICTIM's leg. In fact, he was able to see tissue and possibly joints or bone matter inside. (N.T. 81). Officer Allen immediately requested an ambulance to be sent to the location. (N.T. 81).

Officer Allen spoke with VICTIM briefly. VICTIM related that there was an individual by the name of Michael who came into BAR and initiated a fight with him. VICTIM further told Officer Allen that the assailant possessed a knife and that he vigorously defended himself. (N.T. 82).

After VICTIM was transported to the hospital, Officer Allen entered the BAR. He spoke with SMITH. SMITH told Officer Allen that she observed DEFENDANT cross the street, enter BAR, and approach VICTIM and that the fight then began. (N.T. 83). She also informed Officer Allen that EILER was a bartender at BAR and that when VICTIM spoke with EILER, DEFENDANT did not like that. (N.T. 83).

Officer Allen photographed blood droplets at the crime scene. Given Officer Allen's training and experience, he determined that the droplets of blood were fresh. (N.T. 85). The photographs of the blood droplets depicted blood in the area of the foyer between the poolroom and the bar, on the wall in the foyer, and on the floor which is where the assault at one point moved to. (N.T. 85).

Officer Zimmerman also spoke with SMITH. SMITH indicated that DEFENDANT was still inside BAR. Officer Zimmerman identified

6

DEFENDANT as a black male with a black knit cap on and a black jacket. (N.T. 100). Officer Zimmerman located DEFENDANT inside BAR in the corner of the room, concealing the knife. He stated that DEFENDANT was trying place the knife in a holster tied to the inside of his jacket. (N.T. 102). Officer Zimmerman was able to conduct a search of DEFENDANT. He retrieved two knives on DEFENDANT's person and then took DEFENDANT into custody. (N.T. 101).

When Officer Zimmerman arrested DEFENDANT, DEFENDANT stated that VICTIM was "talking trash on his girl" or something along those lines. He also stated that he did not want matters to progress as they did. (N.T. 103). Officer Zimmerman did not see any gushing open wounds or anything like that on DEFENDANT. However, he did notice some blood on DEFENDANT's hands. (N.T. 103).

Officer Allen traveled to the Hershey Medical Center in order to follow up with VICTIM. He was able to retrieve VICTIM's clothing from the hospital. (N.T. 86). He was also able to speak with VICTIM who told him that the fight was between him and DEFENDANT and that he had received a text message from EILER stating that DEFENDANT was looking for him. (N.T. 87). VICTIM stated to Officer Allen that DEFENDANT was "controlling and possessive" with respect to EILER. Officer Allen was also able to obtain VICTIM's medical records. (N.T. 87).

Because of past problems, BAR maintained a video surveillance system. Office Zimmerman retrieved the tape recording created by this

7

video surveillance system on the night in question. (N.T. 103). Tapes depicting the events in question from two different angles were viewed by the jury at trial. The video clearly depicted that DEFENDANT was the initial aggressor. However, VICTIM actually appeared to "win" the fight. While VICTIM and DEFENDANT were struggling together, VICTIM landed many blows upon DEFENDANT. However, VICTIM did not possess a weapon. The video surveillance images clearly displayed DEFENDANT using the knife that he brought into BAR. The surveillance video also depicted bleeding wounds inflicted by DEFENDANT's slashing and stabbing actions. (N.T. 45-48; Exh. 3)

Officer Patrick McKinney was the supervising officer on the evening of the incident interviewed DEFENDANT. DEFENDANT acknowledged that he knew VICTIM. He also indicated that at one point in time, the two were friends. DEFENDANT further stated that he and VICTIM had a falling out over EILER. (N.T. 111). DEFENDANT told Officer McKinney that he called EILER prior to going to BAR and she confirmed that VICTIM was there. (N.T. 112). Prior to leaving BAR the first time, DEFENDANT told Officer McKinney that he and VICTIM had words. DEFENDANT stated when he left BAR, he went to Gary's Sports Bar. He then returned to BAR because he needed to purchase cigarettes. Officer McKinney did not believe the statement about needing to buy cigarettes as there were many other places to purchase cigarettes, including Gary's Sports Bar. (N.T 113).

8

When Officer McKinney questioned DEFENDANT about some of the issues he had with DEFENDANT's statements, DEFENDANT became very emotional. He sobbed and explained how he felt the incident evolved into what it did. DEFENDANT stated that he wanted the issue between him and VICTIM to be over once and for all. In fact, Officer McKinney testified that DEFENDANT's verbatim statement was "[DEFENDANT] wanted to end it." DEFENDANT was very vague in his description of the assault itself. He stated that he entered BAR, VICTIM stood up and the two came together. (N.T. 114). DEFENDANT did acknowledge that he went into BAR with his knife out. (N.T. 115).

When questioned about the knife found on his person, DEFENDANT stated that he typically carried a smaller knife which he used to open beer cans. (N.T. 116). He stated that he used the larger knife for protection when he would go out at night. (N.T. 146). Officer McKinney observed blood on the DEFENDANT's shoes, his shirt, his face and his hands. (N.T. 116). At no point during the interview did DEFENDANT complain of any injury or pain, nor did he ask to go to the hospital or to seek medical treatment. (N.T. 119).

## II.    PROCEDURAL BACKGROUND

Charges were filed against DEFENDANT on February 16, 2014. The most serious offense alleged was Attempted Homicide. All of the charges stemmed from the stabbing incident that occurred within the Liberty Bar on February 15, 2014.

9

DEFENDANT's case proceeded to trial during the August 2014 term of court. After a full day of testimony, a jury rendered a split verdict on August 6, 2014. The jury acquitted DEFENDANT of the Attempted Homicide charge, but found him guilty of all other counts, including Aggravated Assault. In addition, the jury determined that DEFENDANT employed a deadly weapon during the course of committing the assault.

DEFENDANT was sentenced on October 29, 2014. At sentencing, this Court noted DEFENDANT's significant prior record from North Carolina that included one prior conviction for Assault with a Deadly Weapon. In our Sentencing Order, we also referenced the surveillance videotape that depicted the altercation within the Liberty Bar. We described DEFENDANT as "marching into the bar with the mission of confronting an individual with whom he had prior problems." We also concluded: "But for the grace of God the victim would have been killed." We ultimately imposed an aggregate sentence of 11 ½ to 23 years of imprisonment.

On November 13, 2014, DEFENDANT filed timely Post-Sentence Motions seeking to challenge the weight and sufficiency of evidence against him. On April 9, 2015, we issued an Order denying DEFENDANT's Post-Sentence Motions. We reminded DEFENDANT that he had 30 days to appeal our decision. He did not do so. However, in June of 2015, DEFENDANT filed numerous self-styled documents, including one entitled "Motion to Appoint New Counsel for PCRA and Appeal."[2]

---

[2] Because we mistakenly believed that DEFENDANT had filed an Appeal, we did not take any immediate action regarding the *pro se* documents that he filed.

On December 10, 2015, DEFENDANT again filed numerous documents. In response, we issued a Court Order on December 23, 2015 advising DEFENDANT of his right to file a PCRA Petition within one year following the date on which his conviction was made final. On January 12, 2016, DEFENDANT filed his Post-Conviction Relief Petition. We appointed Attorney Melissa Montgomery to represent DEFENDANT. Attorney Montgomery filed an Amended PCRA Petition on April 5, 2016. Thereafter, we scheduled a hearing for June 20, 2016.

DEFENDANT was transported to Lebanon County and personally appeared at his June 20, 2016 PCRA Hearing. As is our practice in PCRA cases, we asked Attorney Montgomery to outline on the record and in the presence of her client all of the issues that were proposed to be litigated. Attorney Montgomery outlined the following issues:

(1) DEFENDANT's trial counsel failed to object to leading questions asked during the course of trial.

(2) DEFENDANT's trial counsel failed to object to questions at trial seeking to elicit hearsay responses.

(3) Trial counsel failed to cross examine Lori Smith regarding "contradictions on the video."

(4) Trial counsel was ineffective for failing to present VICTIM's toxicology reports.

11

(5)   The District Attorney committed prosecutorial misconduct by advising Patrick Embry where DEFENDANT's knife was located inside his house.

(6)   Trial counsel was ineffective for failing to prove that four charges contained on DEFENDANT's prior record sheet were not actually committed by him.

We received testimony regarding all of the above issues. We issue this Opinion today in order to reject DEFENDANT's various claims.

## III.   LEGAL PRINCIPLES

The PCRA provides for an action by which innocent persons convicted of crimes that they did not commit and persons serving illegal sentences can obtain relief. 42 Pa.C.S. § 9542. The PCRA is the exclusive method by which collateral relief may be obtained in Pennsylvania. *Commonwealth v. Chester*, 733 A.2d 1242, 1250 (Pa. 1999). To be eligible for relief under the PCRA, a defendant must prove the following elements by a preponderance of the evidence: (1) He must prove that he has been convicted of a crime under the laws of this Commonwealth and that he is serving a sentence of imprisonment, probation or parole for a crime; (2) he must prove that the conviction resulted from one of the enumerated errors listed in § 9543(a)(2); and (3) he must prove that the allegation of error has not been previously litigated or waived. Finally, he must prove that the failure to litigate the issue prior to or during trial could

12

not have been the result of any rational, strategic or tactical decision by counsel. 42 Pa.C.S. § 9543(a).

Trial counsel will always be presumed effective, and the Defendant bears the burden of proving otherwise. *Commonwealth v. Lewis*, 708 A.2d 497, 500 (Pa.Super. 1988) (citing *Commonwealth v. Williams*, 570 A.2d 75, 81 (Pa. 1990)). In determining whether counsel rendered ineffective assistance, the court must first determine whether the issue underlying the claim of ineffectiveness is of arguable merit. *Commonwealth v. DiNicola*, 751 A.2d 197, 198 (Pa.Super. 2000) (citing *Commonwealth v. Johnson*, 588 A.2d 1303, 1305 (Pa. 1991)). If the claim is without arguable merit, the Court's inquiry ends, because counsel cannot be deemed ineffective for failing to pursue a meritless issue. *DiNicola*, 751 A.2d at 198.

If a defendant's underlying claim is of arguable merit, we must examine the action chosen by trial counsel in order to ascertain if that action was designed to effectuate the Defendant's interest. *Id.* The fact that trial counsel's strategy may not ultimately have led to an acquittal does not render the strategy legally deficient. *Commonwealth v. Spotz*, 896 A.2d 1191, 1235 (Pa. 2006). The Defendant must establish that but for counsel's deficient performance, the result of his trial would likely have been different. *DiNicola*, 751 A.2d at 198.

## IV.  DISCUSSION

### A.  Potential Evidence Objections

We begin with recognition that "the right to a fair trial is not...the right to a perfect trial..." *Commonwealth v. Pittman*, 466 A.2d 1370, 1376 (Pa.Super. 1983), citing *Commonwealth v. McQuaid*, 417 A.2d 1210 (Pa.Super. 1980).   When ineffectiveness is alleged as a result of an attorney's failure to pursue evidence objections, the Defendant must establish not only that a proper objection would have succeeded, but also that its omission prejudiced the Defendant and was not based upon any reasonable tactic or strategy.  See, e.g. *Commonwealth v. Polston*, 616 A.2d 669 (Pa.Super. 1992).  Stated differently, "Appellant must prove that he was 'prejudiced' by the attorney's decisions. 'Prejudice' can be described as whether, but for the arguably ineffective act or omission, there is a reasonable probability that the outcome [of trial] would have been different." *Commonwealth v. Polston, surpa.* At 677.

With respect to decisions involving admission of evidence, a Trial Judge enjoys wide discretion.  *Commonwealth v. Bell*, 476 A.2d 439 (Pa.Super. 1984).  As our Superior Court has noted:

> Our rules of evidence vest the trial court with the authority to determine the admissibility of evidence as well as to control the scope of examination...Appellate review of the court's rulings under these rules is limited to determining whether the trial judge abused his discretion...As it applies to rulings on the evidence, this standard requires not only technical error but also demonstrated harm; 'evidentiary rulings which should not affect the verdict will not provide a basis for disturbing the jury's judgment.'

14

*Id.* at 925 (citations omitted).

With respect to leading questions, our Superior Court has recently stated: "In modern practice, the use of leading questions lies within the discretion of the trial court and a court's tolerance or intolerance of the leading questions will not be reversed absent an abuse of its discretion." *Commonwealth v. Welton*, 2014 WL10987061 (Jan. 28, 2014), citing *Commonwealth v. Bell*, 476 A.2d 439, 451 (Pa.Super. 1984). While many novice practitioners perceive that all leading questions on direct examination are improper, nothing could be further from the truth. As noted by a leading criminal law commentator:

> A question is leading when it suggests the answer desired. However, questions may reference a particular fact or topic of discussion without being misleading. A question is not leading merely because it may be answered "yes" or "no." Leading questions are permissible on cross-examination, but generally not on direct examination. Leading questions on direct examination are permissible, however, when the witness is deficient in memory, when the witness is called to contradict another, or when such a mode of questioning is consistent with a fair trial, when the witness is not familiar with the English language, speaks English imperfectly, understands the language with difficulty, has a limited vocabulary, or is old, infirm or difficult to understand; when the witness is a child who is not accustomed to court proceedings, or a person who is uneducated, unsophisticated or mentally disabled; or when the witness is hesitant, evasive, reluctant, adverse or hostile. Leading questions, calculated to elicit testimony that is merely introductory or preliminary to material evidence, are also permissible.

*Wharton's Criminal Evidence*, Section 8:15, Leading Questions.

With respect to alleged ineffectiveness for failing to proffer a hearsay objection, our Commonwealth's highest court has declared "that such

claims made in a vacuum cannot provide a basis for relief." *Commonwealth v. Cox*, 728 A.2d 923, 933 (Pa. 1999). If the Commonwealth could have laid a sufficient foundation for the admission of such evidence had a timely objection been made, counsel cannot be deemed ineffective for failing to proffer the objection. *Commonwealth v. Cox, supra.* Moreover, no attorney has a duty to object to hearsay for which an exception to the hearsay rule exists. See, Pa.R.Ev. 803. Similarly, counsel cannot not be ineffective for failing to object to hearsay evidence that was irrelevant or non-prejudicial. *Commonwealth v. Sam*, 635 A.2d 603 (Pa. 1993). On the other hand, where counsel effectively permits the Commonwealth to prove its entire case by hearsay, and where the cumulative effect of that hearsay evidence created prejudice, a defendant could be entitled to a fair trial. See *Commonwealth v. Seltzer*, 437 A.2d 988 (Pa.Super. 1981).

With all of the above legal principles in mind, we will now turn to the specific complaints proffered by DEFENDANT.

### (1)　Transcript Page 20 – Lines 5-10

Within the passage found on page 20, the prosecutor employed leading questions to ask the Liberty Bar owner about the physical layout of the bar. While the questions asked were clearly leading, the information sought was neither challenged nor of critical import to DEFENDANT's claim of self-defense. We view the information as preliminary and undisputed. As a result, leading questions are permitted to elicit such information. Had

an objection been made at trial, we would have overruled it. Therefore, counsel cannot be deemed ineffective for failing to proffer the objection.

### (2)    Transcript, Page 21 - Lines 1-10; 14-25 and Page 22 – Lines 1-3

Within this passage, the prosecutor attempted to "set the stage" for what the jury would observe on the surveillance videotape. The prosecutor pointed out where the witness and VICTIM were located and where the fight between DEFENDANT and VICTIM began. As the prosecutor was asking questions, she was showing still photographs from the surveillance video to the witness.

During this passage, the prosecutor clearly asked leading questions. However, all of the questions were preliminary to the description of the actual stabbing incident. More important, the leading nature of the questions could have easily been cured by the prosecutor had an objection been lodged and sustained. All the prosecutor would have had to do is re-ask her questions in a non-leading fashion. Even had trial counsel lodged a leading question objection, the jury would nevertheless have heard the same information. Thus, trial counsel cannot be deemed ineffective for failing to object to the prosecutor's use of leading questions to describe what was depicted in still photographs.

### (3)    Transcript Page 39 – Lines 3-7

Within this passage of testimony, the Commonwealth elicited testimony that VICTIM received a telephone call from DEFENDANT's girlfriend wherein she said "Mike's looking for you." This was evidence was

17

not presented by the Commonwealth for the truth of the matter asserted; it was presented to help explain VICTIM's state of mind when a confrontation occurred between VICTIM and DEFENDANT several minutes later. As such, the evidence was admissible under the state of mind exception to the hearsay rule. See Pa.R.Ev. 803(3). Moreover, the admission of this evidence was not prejudicial; its impact was clearly peripheral and could not possibly have affected the outcome of DEFENDANT's trial.[3] DEFENDANT's counsel could not be deemed ineffective for failing to object to this passage of testimony.

### (4)    Transcript Page 46 – Lines 1-2

DEFENDANT argues that his attorney should have objected to the leading question: "This object here in his left hand, is that the knife?" We do not view this question as leading simply because it could be answered with a "yes" or "no." More important, the prosecutor immediately re-asked the question in a non-leading manner:

> Q.    Now, again here in his left hand raised up, what's in his hand?
>
> A.    The knife.

(N.T. 46). This passage could not possibly have prejudiced DEFENDANT to the extent that PCRA relief should be granted.

---

[3] It is not as though the victim claimed that DEFENDANT's girlfriend stated something to the effect: "Mike is looking for you because he plans to stab you."

### (5)  Transcript Page 72 – Line 14

During cross examination, DEFENDANT's attorney asked the victim: "And for some reason now today you know that she went to the house with him to get a knife?" In response, VICTIM responded: "Yeah. Mike's daughter told me about it." (N.T. 72).

There is no evidence that trial counsel intentionally sought to elicit a hearsay response by her question. Moreover, trial counsel actually exploited this answer by immediately pointing out to the jury that VICTIM's statement disclosed a detail that had never been disclosed previously. (N.T. 72).

During her entire cross examination, trial counsel's primary objective was to paint VICTIM as someone who was flippant and easy to anger. Viewed within the context of this legitimate trial strategy, the entirety of counsel's cross examination was actually quite effective, and counsel was able to use VICTIM's unsolicited statement about DEFENDANT's daughter to her advantage. We do not view the passage on page 72 to be prejudicial to DEFENDANT. Accordingly, it cannot afford the basis for PCRA relief.

### (6)  Transcript Pages 82-83

During testimony of Officer John Allen, the prosecutor elicited brief testimony about what both VICTIM and Lori Smith said upon his arrival on the scene. During the testimony, the officer described VICTIM's state of

19

mind and physical condition; he was bleeding profusely as a result of multiple wounds. (N.T. 81-82).[4]

The prosecutor's questioning of Officer Allen clearly elicited hearsay information that was directly relevant to the charges lodged against DEFENDANT. However, both VICTIM and Lori Smith testified at trial and were subject to extensive cross examination by trial counsel. The information presented through Officer Allen was neither new nor different from what the jury had already heard.

In the interest of candor, we very well may have sustained a hearsay objection had it been lodged during Officer Allen's testimony. However, there also may have been additional foundation evidence that could have been presented by the Commonwealth to support the introduction of such hearsay.[5] More important, we question the import of the evidence that was introduced. Given that the jury heard directly from VICTIM and Lori Smith, and given that the jury watched the video of the stabbing altercation, we have a hard time believing that the brief hearsay-laden exchange during Officer Allen's testimony could have or would have changed the jury's ultimate decision. Because we conclude that Officer Allen's hearsay information did not cause prejudice to DEFENDANT, we will deny his claim for PCRA relief.

---

[4] As such, it could be argued that VICTIM's statement was admissible as an excited utterance.

[5] Moreover, during cross examination, trial counsel attempted to impeach the veracity of both VICTIM and Ms. Smith. It could therefore be argued that the testimony presented through Officer Allen elicited prior consonant statements that would be admissible as an exception to the hearsay rule. See, e.g. _____.

20

## (7)   Transcript Page 103 – Lines 4-9

Officer Brant Zimmerman was the first one to arrive at the Liberty Bar following the stabbing incident. During Officer Zimmerman's testimony, the prosecutor asked what was said to him upon arrival. Officer Zimmerman provided a three sentence response describing in broad strokes what Lori Smith said to him.

Prosecutors are permitted to ask police officers about what they were told and what they confronted when arriving at a crime scene. The purpose of this evidence is to explain how the police officer responded. See, e.g. *Commonwealth v. Dent*, 837 A.2d 571 (Pa.Super. 2005).

In addition, our analysis with respect to the passage on page 103 is identical to our analysis with respect to the passage recorded on pages 82 and 83. The brief testimony from Officer Zimmerman elicited to explain what happened upon his arrival at the scene of the crime was not lengthy, nor was it different from testimony that was provided directly from Lori Smith herself. Lori Smith testified and was subject to cross examination, and all of the information attested to by Officer Zimmerman was clearly depicted in the video of the event that the jury observed. Under these circumstances, the information presented was not prejudicial and trial counsel cannot be deemed ineffective for failing to challenge the introduction of hearsay through Officer Zimmerman.

21

## B.    Failure to Call Witnesses

DEFENDANT argues that trial counsel was ineffective for failing to call EILER, Dawn Justiano, Java Pinson and Latoya Williams as witnesses. Of these individuals, only EILER testified at the PCRA Hearing.  EILER acknowledged that she is DEFENDANT's long-term girlfriend.  EILER stated that after the stabbing incident, VICTIM threatened DEFENDANT.

DEFENDANT's trial counsel testified that she was never given the names of Java Pinson or Latoya Williams.  While she did hear the name Dawn Justiano, DEFENDANT was not able to afford trial counsel with either the address or phone number of Ms. Justiano.  We find trial counsel's testimony regarding Justiano, Pinson and Williams to be credible.  None were "available" to trial counsel during DEFENDANT's trial.

With respect to Melissa Eiler, trial counsel confirmed that DEFENDANT had provided her name.  Trial counsel met with EILER prior to trial.  She became concerned that EILER would present information that actually hurt DEFENDANT.  EILER had said to trial counsel that VICTIM had made romantic entreaties toward her.  Trial counsel was concerned that this information would have bolstered the Commonwealth's theory that DEFENDANT attacked VICTIM as a result of jealousy.  Because of this fear, trial counsel chose not to call EILER.

Based upon her testimony at the PCRA Hearing, we fail to perceive how EILER's testimony could possibly have benefited DEFENDANT. EILER was very clear that the threats made by VICTIM toward DEFENDANT

22

occurred _after_ the stabbing incident and not before. They thus were not relevant to bolster DEFENDANT's claim of self-defense. Moreover, we understand and agree with trial counsel's fear that the Commonwealth could have elicited information from EILER on cross-examination that would have been devastating to DEFENDANT.

We reject all of DEFENDANT's PCRA claims relating to his so-called exculpatory witnesses. There is no proof that three of the witnesses were even available at the time of trial, and there is absolutely nothing that would indicate that any of the proffered witnesses would have impacted the outcome of DEFENDANT's trial. We will therefore deny DEFENDANT's witness-related PCRA claim.

### C.    Failure to Cross Examine Lori Smith

DEFENDANT argues that his trial counsel should have cross-examined Lori Smith with respect to what he characterized as "contradictions with the video evidence." At the PCRA Hearing, DEFENDANT could not provide specific details about how Ms. Smith should have been cross examined in a different manner. Moreover, when confronted about what was actually depicted on the video, DEFENDANT claimed that the video surveillance tape had actually been altered.

Absolutely no credible information was presented at the PCRA Hearing that would corroborate DEFENDANT's self-serving proclamations about alteration of the surveillance videotape. At trial, we watched the same video that was seen by the jury, and we listened to Ms. Smith's

23

description of events. Nothing of substance was inconsistent. Moreover, there is no proof anywhere that either Ms. Smith or the police had the ability or inclination to alter the videotape in an effort to frame DEFENDANT for something he did not do. DEFENDANT's PCRA claims regarding the videotape evidence will therefore be denied.

### D.    Toxicology Reports

At the time of the PCRA Hearing, DEFENDANT argued that his attorney should be deemed ineffective for failing to present VICTIM's toxicology report that revealed "massive amounts of drugs" in VICTIM's system. After much back and forth, even DEFENDANT's attorney was forced to concede that no such toxicology reports exist. For this reason alone, DEFENDANT's PCRA claim regarding toxicology will be denied.[6]

### E.    Prosecutorial Misconduct

According to DEFENDANT, VICTIM testified at trial that DEFENDANT kept his knife on a hook affixed to a wall within his home. DEFENDANT theorizes that the only way VICTIM could have come into possession of this information was through the prosecutor's office. He accuses the prosecutor of misconduct for planting this information inside VICTIM's head and then eliciting it at trial.

---

[6] In addition, trial counsel pointed out that she was able to elicit testimony about VICTIM's consumption of alcohol on the night of the incident. Based upon the information that was elicited, trial counsel was able to proffer a credible closing argument that painted VICTIM as an intoxicated and out-of-control individual. Given the information that was presented, VICTIM's toxicology report, even if it had existed, would have been little more than cumulative.

There are multiple problems with DEFENDANT's argument. First, there is no information that the prosecutor knew the whereabouts of DEFENDANT's knife within his home. Second, there is no information that the prosecutor related this information to VICTIM. Third, we do not adopt DEFENDANT's theory that a prosecutor commits misconduct every time he/she tells one witness what another has said. Finally, and perhaps most important, the trial transcript is devoid of any testimony indicating where DEFENDANT kept a knife within his home.

When confronted on cross examination with the above, DEFENDANT insisted that he remembered VICTIM describing the location of the knife. He then accused the court reporter of falsifying the transcript by eliminating that testimonial exchange.

DEFENDANT's arguments pertaining to prosecutorial misconduct are ludicrous. There is no evidence that the prosecutor acted improperly, and there is no evidence that the court reporter falsified the transcript by omitting a portion of the testimonial exchange that occurred. If anything, DEFENDANT's prosecutorial misconduct claim illustrates the depth of his desperation. We cannot and will not give credence to that desperation.

### F.    Prior Criminal Record

DEFENDANT acknowledged that he was convicted in North Carolina for Armed Robbery and Assault With A Deadly Weapon With Intent To Kill. He also did not dispute a multitude of past misdemeanor convictions.

25

However, he claims that he did not commit four felony offenses that were listed on his prior record sheet. The offenses DEFENDANT disputes are:

(1) 12/13/90 – Armed Robbery

(2) 12/20/90 – Attempted Sale of Cocaine

(3) 10/7/91 – Larceny[7]

(4) 5/3/2000 – Possession With Intent To Deliver A Controlled Substance.

The Commonwealth presented evidence from Tonya Zeigler, who is employed by the County of Lebanon to ascertain and verify the prior criminal records of a defendant. Ms. Zeigler testified that she obtained DEFENDANT's "R.A.P. sheet" by utilizing DEFENDANT's full name, date of birth and Social Security. In addition, Ms. Zeigler ran DEFENDANT's fingerprints on a "ten-printer," which is a device used to scan and compare fingerprints. Ms. Zeigler testified that the prior criminal record submitted to the Court was verified as belonging to DEFENDANT because his name, date of birth, Social Security and fingerprints were all identical to the ones maintained for the individual who had previously committed the crimes in North Carolina.

DEFENDANT's trial counsel acknowledged that her client denied committing some of the North Carolina offenses that were on his record. Trial counsel investigated the possibility of mistaken identity. When trial counsel learned that the prior record had been verified by name, date of

---

[7] We fail to perceive why this crime was even mentioned. DEFENDANT was acquitted o; this offense and it was not considered in calculating DEFENDANT's prior record score.

26

birth, Social Security number and fingerprints, she concluded that DEFENDANT was simply wrong with respect to his prior record score claim. We agree with trial counsel's assessment.

In addition, we took some time at the PCRA Hearing to question whether DEFENDANT's challenge to his prior record score even mattered. According to Ms. Zeigler and the official Presentence Investigation Report, DEFENDANT's prior record classified him as an RFEL – a repeat felony offender. With such classification, the 10 to 20 year sentence imposed on the Aggravated Assault charge fell within the standard sentencing range. In comparison, if one were to eliminate the felony convictions challenged by DEFENDANT, he would have been classified with a prior record score of 5. Even with a prior record score of 5, the 10 year minimum sentence imposed on the Aggravated Assault charge would have fallen within standard sentencing range.

When we sentenced DEFENDANT, we believed that 10 to 20 years was an appropriate sanction given his background and the nature of his conduct. The difference between a prior record score of 5 and a characterization of being an RFEL would not have changed our opinion regarding the appropriateness of DEFENDANT's sentence.[8]

---

[8] In our Sentencing Order, we cited the fact that DEFENDANT had a prior criminal history for Assault Using A Deadly Weapon. DEFENDANT does not dispute having such a past criminal history. Therefore, the information set forth in our Sentencing Order is accurate even if one were to adopt DEFENDANT's argument regarding his prior record score.

27

Like DEFENDANT's other PCRA arguments, we reject the one he has proffered regarding his prior record. We conclude that DEFENDANT's prior record score was calculated correctly. Even if it were not, the difference between the official prior record and DEFENDANT's claimed prior record would not have caused us to alter our sentence. For these reasons, DEFENDANT's PCRA claim regarding his prior record score will be denied.

## V.   CONCLUSION

The key piece of evidence in this case has always been the videotape that depicts the altercation between DEFENDANT and VICTIM. That videotape showed DEFENDANT repeatedly stabbing VICTIM. While other evidence was presented to provide context to the video, it was the video itself that formed the cornerstone of the Commonwealth's prosecution. Nothing at trial and nothing during the 2016 PCRA hearing has assailed the video or what it depicted. No matter how many straws DEFENDANT now attempts to grasp, the fact remains that he was caught on tape attacking and stabbing another man inside the Liberty Bar. It is DEFENDANT's conduct and the videotape that recorded that conduct that led to the jury's verdict...not the ineffectiveness of trial counsel.

We categorically reject all of DEFENDANT's PCRA claims against his trial counsel. Given the overwhelming evidence, trial counsel accomplished much to prevent DEFENDANT from being convicted of Attempted Homicide. We certainly cannot and will not declare trial counsel's efforts on behalf of

DEFENDANT to be ineffective. Accordingly, DEFENDANT s PCRA Petition will be denied.